[Cite as *State v. Petrie*, 2016-Ohio-4941.]

STATE OF OHIO      )                    IN THE COURT OF APPEALS
                           )ss:            NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT    )

| | |
|---|---|
| STATE OF OHIO | C.A. No.      27490 |
|     Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| MICHAEL J. PETRIE | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
|     Appellant | CASE No.      CR 2013 04 0968 |

DECISION AND JOURNAL ENTRY

Dated: July 13, 2016

CARR, Presiding Judge.

{¶1}    Appellant, Michael Petrie, appeals his conviction by the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2}    On April 3, 2013, Barberton Police officers went to the home of Maureen Soltis to perform a welfare check at the request of her brother. Officers entered the home and found Ms. Soltis's decomposed body in a living room chair. Her son, Michael Petrie, cooperated with the police and acknowledged that he had killed his mother about six months earlier. Mr. Petrie later described the murder to police and explained the steps that he took to cover the body and mask the evidence of decomposition while he continued to live in the house.

{¶3}    Mr. Petrie was charged with aggravated murder in violation of R.C. 2903.01(A), murder in violation of R.C. 2903.02(A) and (B), felonious assault in violation of R.C. 2903.11(A)(1) and (2), and abuse of a corpse in violation of R.C. 2927.01(B). Mr. Petrie

pleaded not guilty by reason of insanity and moved the trial court for a competency evaluation. The trial court determined that Mr. Petrie was capable of understanding the nature of the proceedings against him, and the case proceeded to a jury trial. Three expert witnesses testified regarding Mr. Petrie's insanity plea, and they reached three different conclusions. The defense expert testified that Mr. Petrie suffered from a severe mental illness and, as a result, did not know the wrongfulness of his actions at the time he murdered his mother. The State's expert agreed that Mr. Petrie suffered from a severe mental illness, but concluded that Mr. Petrie knew the wrongfulness of his actions at the time of the murder. Finally, an independent expert ordered by the court disagreed with the other experts on the first point, concluding that Mr. Petrie did not suffer from a severe mental illness. The jury found Mr. Petrie guilty of aggravated murder, murder, and abuse of a corpse. The trial court merged the counts of aggravated murder and murder and sentenced Mr. Petrie to life in prison without the possibility of parole. The trial court also sentenced him to an eleven-month prison term with respect to his conviction for abuse of a corpse.

II.

**ASSIGNMENT OF ERROR**

PETRIE'S CONVICTIONS FOR AGGRAVATED MURDER AND MURDER
WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶4}** Mr. Petrie's single assignment of error is that his convictions for aggravated murder and murder are against the manifest weight of the evidence because he was insane at the time of the crime. We disagree.

**{¶5}** When considering whether a conviction is against the manifest weight of the evidence, this Court must:

> review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). A reversal on this basis is reserved for the exceptional case in which the evidence weighs heavily against the conviction. *Id.*, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A criminal defendant who pleads not guilty by reason of insanity must prove by a preponderance of the evidence "that at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts." R.C. 2901.01(A)(14); R.C. 2901.05(A). When expert witnesses differ in their opinions regarding the insanity defense, a jury must make a credibility determination when deciding which experts to believe. *State v. Murphy*, 4th Dist. Ross No. 15CA3475, 2016-Ohio-1165, ¶ 39.

{¶6} Three experts testified with respect to Mr. Petrie's sanity at the time of the offense. Each was experienced and well-qualified in their field. Mr. Petrie, with whom the burden of proof rested on the issue, called Dr. James Orlando, Ph.D., of Summit Psychological Associates. The State called two experts. Dr. Lynn Luna Jones, Ph.D., of the Psycho-Diagnostic Clinic serving Summit, Medina, Portage, Geauga, and Stark Counties, performed a court-ordered sanity evaluation and was called as a witness by the State. Dr. Stephen G. Noffsinger, M.D., of the Cuyahoga County Psychiatric Clinic and Case Western Reserve University, was retained by the State to render an opinion.

{¶7} Dr. Lynn Luna Jones acknowledged that she did not review Mr. Petrie's extensive medical history, but testified that her evaluation was based on a 7.8-hour interview, the administration of an MMPI-2 inventory, and her review of Mr. Petrie's statements at the time of

his arrest. On this basis, she opined that because she did not see "a very long-term history of one or two of several different cultures of symptoms: hallucinations, delusions, disorganized speech, disorganized behavior, things like that[,]" she did not believe there to be enough evidence to diagnose Mr. Petrie with schizophrenia. Instead, her opinion was that Mr. Petrie was best diagnosed with a generalized anxiety disorder and schizotypal personality disorder. Dr. Luna Jones observed that Mr. Petrie tended to exaggerate his symptoms and "attempted to present an unrealistically negative picture of himself." She testified that regardless of whether he had a severe mental disease at the time of the murder, Mr. Petrie appreciated the legal and moral wrongfulness of his actions, but believed that he was justified because his mother deserved it, and "his behavior should be considered acceptable." She concluded that Mr. Petrie had a rational motive for his actions in that he acted out of rage arising from a history of abuse, and she rejected the suggestion that he believed that his mother exerted a supernatural degree of control over him.

{¶8} Both Dr. Orlando and Dr. Noffsinger opined that at the time of the offense, Mr. Petrie suffered from schizophrenia, a severe mental disease that may wax and wane in intensity over the lifespan of an individual, but that is incurable. As both noted, this diagnosis was supported by Mr. Petrie's lengthy medical history dating from his early teens up until the staff of the Summit County Jail diagnosed him as schizophrenic upon his arrest for the crimes at issue. The area of disagreement between Dr. Orlando and Dr. Noffsinger is narrow: whether Mr. Petrie's schizophrenia caused him not to know the wrongfulness of his actions at the time he committed the murder. Both Dr. Orlando and Dr. Noffsinger opined that this determination includes a legal and moral component. Both concluded that Mr. Petrie knew his actions were legally wrong. One concluded that he believed his actions were morally justified, but the other

disagreed. This case, therefore, presents us with a point-by-point conflict between experts on a narrow issue, and we do not need to define "wrongfulness" with precision in order to determine whether the standard of review for manifest weight of the evidence warrants reversal.

{¶9} Both Dr. Orlando and Dr. Noffsinger testified that they reviewed Mr. Petrie's extensive medical record, and they largely agreed on what it represented. Mr. Petrie did not have a significant history of drug or alcohol use, although he did report some. His first contact with the mental health system was in 1995, when Mr. Petrie was hospitalized with depression, self-harm, and suicidal thoughts. Medical professionals initially diagnosed Mr. Petrie with major depression with psychotic features, a conduct disorder, and indications of drug and alcohol abuse. Noting that Mr. Petrie's diagnosis changed during his teenage years, Dr. Orlando explained that an early onset of schizophrenia is uncommon and frequently misdiagnosed at first in children because doctors witness the early progression of their symptoms. In any event, Mr. Petrie was diagnosed with paranoid schizophrenia by his sixteenth birthday, and he received treatment from age 16 to age 30, when he dropped out of treatment and stopped taking his medication. During this period, three separate medical professionals diagnosed Mr. Petrie with schizophrenia. Dr. Orlando and Dr. Noffsinger agreed that during treatment, Mr. Petrie suffered from delusions and hallucinations, both visual and auditory. Both further noted that Mr. Petrie fantasized about violence directed toward his mother and other family members, although Dr. Noffsinger attributed this behavior to a separate diagnosis of a personality disorder. Mr. Petrie's medical records indicated that medication abated his symptoms to a degree, but that Mr. Petrie did not like the side effects.

{¶10} Dr. Orlando also described information that he gained from various sources about Mr. Petrie's relationship with his mother. Dr. Orlando characterized the relationship as "very

pathological" and "very codependent." He explained that Mr. Petrie wore diapers until second grade, and that he and his mother slept and showered together until Mr. Petrie was twelve years old. Because Mr. Petrie's mental illness left him unable to attend school, he was tutored at home after eighth grade. Dr. Orlando explained that Mr. Petrie's social life and relationships were "nonexistent." The other experts were aware of this background information, having been provided with Dr. Orlando's written summary.

{¶11} Although their testimony had much in common, Dr. Orlando and Dr. Noffsinger disagreed with regard to the methodology of their evaluation and the conclusions that flowed from it. Dr. Orlando explained that the basis for his evaluation was "the context of the defendant's life and mental health history and functioning during the course of his life." He emphasized information gained through his interviews with Mr. Petrie, which totaled 6 1/2 hours in length, and he observed that characteristic of schizophrenia, Mr. Petrie is mistrustful. In Dr. Orlando's opinion, one could not get much information from Mr. Petrie through a short or casual meeting. Dr. Orlando testified that in a meeting of less than two hours, it would be "very difficult to discern some of the information we were able to uncover with [Mr. Petrie]."

{¶12} That information led Dr. Orlando to conclude that although Mr. Petrie did know that it was illegal to murder his mother, he did not know the wrongfulness of his actions in a moral sense. On the first point – that Mr. Petrie knew his actions were illegal – Dr. Orlando was clear. In his opinion, Mr. Petrie knew that if the police discovered what he had done, he would be arrested. Dr. Orlando also opined, however, that Mr. Petrie killed his mother under the delusion that she exerted an almost supernatural power over him and with the conviction that doing so, while legally wrong, was morally justified because "killing his mother was the only way to be free from her hold over him." He characterized Mr. Petrie's relationship with his

mother as "an extreme love/hate relationship" and noted that Mr. Petrie "essentially hated her." With Mr. Petrie's mental health history in view, Dr. Orlando noted that he perceived himself to be a "mystic" with the ability to see the future and "[a] lot of bizarre ideas about the devil and God[.]" Dr. Orlando observed that Mr. Petrie's paranoid delusions and sense of "grandiosity" were consistently noted throughout his medical records. Dr. Orlando summarized his opinion of how Petrie perceived his mother's murder:

> Mr. Petrie came to believe, and firmly came to believe, that he could not get away from his mother as long as she was alive, that she absolutely had this power or control over him. He talked about that he could not escape her power or her control no matter what. * * * He believed that he had to do this to be free. He didn't see any other option. He didn't see any option in moving away. He didn't see any option of living anywhere else. And, in fact, once she was dead, quite frankly, that was the best of both worlds for him because he really didn't want to be away from her and he was okay with living in there, eating pizzas and watching the Cavs game on a regular basis with his mother dead feet away because she was there * * * but she no longer had any power and control over him. And he was clear about that * * * he doesn't vacillate from that at all because he really believes it.

Dr. Orlando rejected the idea the Mr. Petrie acted out of rage, and he opined that Mr. Petrie did not believe he had done anything wrong.

{¶13} In Dr. Orlando's opinion, any steps that Mr. Petrie took to cover up the crime were not evidence that he tried to avoid detection because he knew that what he had done was wrong, but efforts to prolong his ability to live with his mother without her interference in his life. Thus, Dr. Orlando's ultimate conclusion was that although Mr. Petrie knew that his actions were *legally* wrong, his severe mental disease caused him to believe that they were *morally* justified.

{¶14} Dr. Noffsinger employed a different methodology. In his words, "conducting a sanity evaluation is a forensic mental health evaluation. It requires specific training. It's very different than doing a mental health evaluation for the purpose of treatment. It's a different kind

of methodology and different kind of thinking involved." Dr. Noffsinger explained that his primary focus in conducting a sanity evaluation is a thorough review of case history and records. He explained:

> I could have spent hours, such as six hours, ten hours, or as much time as I needed doing a personal interview, but what the defendant tells you there kind of carries less weight for several reasons. One is it's usually given weeks to months to years after the offense.
>
> In this case the offense took place on 10/16/12 and I was interviewing Mr. Petrie 17 months later. So his account that he gave me on March 19th, to me, would have carried less weight because, first of all, his memory would have - - would have faded or been contaminated just with the passage of time.
>
> Secondly, with some defendants given that period of time [they] may construct an account that might be self-serving and support their defense of insanity.

Dr. Noffsinger added that for these reasons, his focus is on any records that could reflect a defendant's mental state at the time of the offense. In addition, Dr. Noffsinger noted that there are some recognized situations in which a defendant operates under a psychotic delusion "that they are morally justified and some greater good will come about by breaking the law," but rejected that principle in this case. Instead, he concluded that the evidence demonstrated that Mr. Petrie clearly knew that his actions were illegal.

{¶15} Employing this methodology, Dr. Noffsinger concluded that although Mr. Petrie has a severe mental disease, his diagnosis of schizophrenia did not impair his knowledge of the wrongfulness of his actions on the day that he committed the murder. According to Dr. Noffsinger, Mr. Petrie's statements and actions indicate "ample evidence" that he acted with a rational motive: anger. Specifically, Dr. Noffsinger noted that Mr. Petrie told police shortly after his arrest that he was "fed up" with how his mother treated him and that he explained, "We didn't like each other. She was hard on me all of my life. I had the urge, I killed her and that was it." Mr. Petrie explained his actions to Dr. Noffsinger in the same way, saying that he

believed killing his mother was the only way to end a lifetime of mental abuse. He also told Dr. Noffsinger that "as he killed his mother, he said, 'I f**cking hate you, that's it.' [a]nd * * * 'Die, you bitch.'" Dr. Noffsinger testified that the nature and extent of Ms. Soltis's injuries corroborate the anger that Mr. Petrie identified as his motive.

{¶16} Dr. Noffsinger also reasoned that Mr. Petrie did not exhibit a psychotic motive that caused him to believe that his actions were not wrongful. Specifically, Dr. Noffsinger noted that Mr. Petrie did not perceive himself to be acting in self-defense, nor did he indicate that he suffered any hallucinations at the time of the offense. Instead, he observed that Mr. Petrie's behavior during and after the offense was "clear evidence that he knew he had done something wrong." In this vein, Mr. Petrie told Dr. Noffsinger that he did not call the police "because he knew he would go to jail and serve a prison sentence. * * * [H]e knew he would be caught eventually for the offense." When asked how he could reconcile a diagnosis of severe mental illness with rational motives, Dr. Noffsinger explained:

> [P]eople who have a mental illness are still able to act on rational motives just like all of us. [They] can do things because of anger, because they want money, because they want revenge, because they want sexual gratification, or whatever. Just because one is mentally ill does not mean that every action that that person undertakes is driven by their mental illness, it's driven by other factors as well.

Dr. Noffsinger also rejected Dr. Orlando's opinion that Mr. Petrie believed he had no means of escape from his mother's control but to kill her:

> First of all, that's not what he told me and not what he told the police. So I would put less weight on that being accurate, given that it was only given to Dr. Orlando and was not corroborated by what he said closer in time to the killing[.]

He summarized his conclusion on this issue succinctly: "[T]here was no greater good to be had by him killing his mother. He wasn't going to save the world."

{¶17} Dr. Luna Jones disagreed with Mr. Petrie's diagnosis, but agreed with Dr. Noffsinger to the extent that he concluded that Mr. Petrie knew the wrongfulness of his actions. Although Dr. Orlando and Dr. Noffsinger agreed with respect to Mr. Petrie's diagnosis that he suffered from a severe mental disease at the time of Ms. Soltis's murder, they diverged on the issue of whether the severe mental disease caused Mr. Petrie not to know the wrongfulness of the act. All three experts are highly qualified, experienced, and well-respected in their field; all authored persuasive expert reports and offered articulate and credible testimony in this case. We cannot say that the evidence weighs heavily in favor of Dr. Orlando's opinion, as Mr. Petrie advocates, nor can we conclude that the jury lost its way by accepting one expert opinion instead of the others. In other words, the evidence in this case is balanced, and in these circumstances, we cannot say that this is the exceptional case in which we must reverse the conviction as against the manifest weight of the evidence.

{¶18} Mr. Petrie's assignment of error is overruled.

## III.

{¶19} Mr. Petrie's assignment of error is overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

_____

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

HENSAL, J.
SCHAFER, J.
CONCUR

APPEARANCES:

NICHOLAS SWYRYDENKO, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.