[Cite as *State v. Mitchell*, 2016-Ohio-7691.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 26887 |
| | : | |
| v. | : | Trial Court Case No. 14-CR-672 |
| | : | |
| RYAN D. MITCHELL | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the _____10th_____ day of _____November_____, 2016.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by LYNNE R. NOTHSTINE, Atty. Reg. No. 0061560, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45402
        Attorney for Plaintiff-Appellee

LORI R. CICERO, Atty. Reg. No. 0079508, Cicero Adams, L.L.C., 500 East Fifth Street, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

HALL, J.

{¶ 1} Ryan D. Mitchell appeals from his conviction and sentence on charges of felony murder, grand theft, assault on a police officer, having a weapon while under

disability, and a firearm specification.[1]

{¶ 2} Mitchell advances three assignments of error. First, he contends the jury's verdict is against the manifest weight of the evidence. Second, he claims the trial court erred in instructing the jury, thereby violating his due-process rights. Third, he raises a claim of ineffective assistance of counsel.

{¶ 3} The present appeal stems from Mitchell's execution-style murder of his girlfriend, Melissa Nilson, in February 2014. The State's evidence at trial established that, following a dispute, Mitchell shot Nilson in the head at point-blank range while she was on her knees in the front yard of her home begging for her life with her hands in the air. After briefly walking away from Nilson's body, Mitchell went inside her home and retrieved her car keys. He then sped away as police sirens could be heard approaching the scene. While fleeing from police at a high rate of speed, Mitchell crashed Nilson's car. A foot chase ensued, and police eventually apprehended him in the kitchen area of a business known as Jackass Flats in Huber Heights.

{¶ 4} At trial, Mitchell did not seriously dispute committing the offenses at issue. Rather, the defense strategy was that he was not guilty by reason of insanity (NGRI). The record contains evidence that Mitchell repeatedly yelled at Nilson's lifeless body to "get up" after shooting her. He also was overheard making bizarre statements after the shooting. When police encountered Mitchell at Jackass Flats, he yelled that they were in the house of God and exclaimed that he was going to send the officers to Heaven. While wrestling with police, he was heard saying, "Strip me of these tattoos," "Grandma is in

---

[1] Mitchell also was found guilty of numerous other offenses that merged into those set forth above for purposes of sentencing.

here," and "Where's Dave?" Once outside the business, he repeated rap lyrics and referred to zombies. A police officer also overheard him saying, "Tickle me again" and "This is a video game."

{¶ 5} Mitchell's friends and family members testified about his strange behavior prior to the shooting. His brother, Robert, testified that Mitchell had reported hearing things and had expressed a belief that he was being watched and listened to by televisions and phones. Robert also recalled Mitchell saying Nilson's house was demon possessed. Mitchell's grandmother, Miriam, testified that Mitchell had mentioned aliens being everywhere listening to his conversations. She also mentioned Mitchell being obsessed with paranoid delusions, including a belief that Nilson's house was full of demons and that Nilson was the Devil. Family friend Freeda Hartly recalled Mitchell being frantic about demons, aliens, and other paranoid ideations. Mitchell's nephew, Vincent, testified that Mitchell believed aliens were coming to get them and that they needed to flee to a mountain in Kentucky. Mitchell's father, David, testified that Mitchell believed he lived in a demon-possessed home. After being booked into jail, Mitchell received the anti-psychotic drugs Haldol and Zyprexa, along with the anti-anxiety drug Ativan. He later was given the anti-depressant Trazodone and anti-psychotic drug Rispersal. He also received another drug, Cogentin, to address the side effects of the other drugs.

{¶ 6} With regard to Mitchell's NGRI defense, the record contains testimony from three expert witnesses who examined him in jail. The first expert, psychologist Barbara Bergman, testified as a defense witness. She concluded that Mitchell "was suffering from a severe mental illness" when he shot Nilson. (Trial Tr. at 573). Specifically, she diagnosed "schizoaffective disorder bipolar type" with an "acute manic episode." (*Id.*).

Bergman also opined that as a result of his severe mental illness Mitchell was unable to determine whether his actions were right or wrong. (*Id.* at 577, 652).

**{¶ 7}** The second expert, psychologist Thomas Martin, testified as a prosecution witness. He testified about his administration of an "SIRS" test to Mitchell. Seven out of eight of Mitchell's scores on the test fell into the "probable feigning" category, which suggested that Mitchell was exaggerating his symptoms of mental illness. (*Id.* at 748). Martin stated that Mitchell's combination of scores on the SIRS test was "generally not found in a clinical population of genuinely psychotic individuals." (*Id.*) Nevertheless, based on all of the information he possessed, Martin concluded that Mitchell was suffering from a non-specified mental disease or defect when he committed the crimes at issue. (*Id.* at 786, 816-817). Martin also concluded, however, that Mitchell knew the wrongfulness of his actions when he committed the offenses. (*Id.* at 786-787, 800, 802, 821-826).

**{¶ 8}** The third expert, psychologist Massimo De Marchis, also testified as a prosecution witness. Unlike the other two experts, De Marchis diagnosed Mitchell as having a "paranoid personality" and an "antisocial personality disorder." (*Id.* at 872). He explained, however, that these were "character disorders" as opposed to "psychotic disorders." (*Id.* at 873, 897). De Marchis also testified about his administration of an "MMPI" test to Mitchell. He concluded that Mitchell's test results were invalid. This was so because Mitchell "endorsed virtually every item of the test that would have been consistent with mental illness." (*Id.* at 877). According to De Marchis, the test results established that Mitchell was malingering and "purposefully trying to look like he suffered from a serious mental illness." (*Id.*). De Marchis opined that when Mitchell killed Nilson "his actions were deliberate and not in response to any perceived threats triggered by

paranoid or delusional ideation." (*Id.* at 895). Although De Marchis did not believe Mitchell was suffering from any true psychosis that would qualify as a mental disease or defect at the time in question, he opined that Mitchell's reported symptoms, if they really existed, were "more similar to a drug induced psychosis than to anything else." (*Id.* at 929, 935). In any event, De Marchis concluded that Mitchell knew the wrongfulness of his actions at the time of his offenses. (*Id.* at 898-899, 962).

**{¶ 9}** The jury ultimately rejected Mitchell's insanity defense, and he was convicted and sentenced on the charges set forth above.[2] The trial court imposed an aggregate sentence of 22.5 years to life in prison. This appeal followed.

**{¶ 10}** In his first assignment of error, Mitchell contends the jury's rejection of his NGRI defense is against the manifest weight of the evidence. He asserts that the record lacks "substantial evidence" on which the jury could have relied to find that he knew the wrongfulness of his actions. In particular, he argues that psychologist Bergman "was consistent and unchallenged during cross-examination concerning her conclusion that [he] did not know the wrongfulness of his actions based on suffering from a severe mental illness." (Appellant's brief at 10). Although psychologists Martin and De Marchis disagreed with Bergman as to whether Mitchell knew the wrongfulness of his actions, Mitchell contends the evidence on that issue was "far from substantial," "conflicting," and "uncertain." (*Id.*). Noting that he was only required to establish his insanity defense by the preponderance of the evidence, Mitchell urges us to "exercise [our] authority and remand this case for a new trial." (*Id.*).

---

[2] Parenthetically, we note that the weapons-under-disability offense was tried separately to the trial court, which found him guilty.

{¶ 11} When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 12} The credibility of the witnesses and the weight to be given to their testimony primarily are matters for the trier of fact to resolve. *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is apparent that the trier of fact lost its way in arriving at its verdict. *State v. Bradley*, 2d Dist. Champaign No. 97-CA-03, 1997 WL 691510 (Oct. 24, 1997).

{¶ 13} With the foregoing standards in mind, we conclude that the jury's rejection of Mitchell's NGRI defense is not against the weight of the evidence. In reaching this

conclusion, we recognize that Mitchell was only required to establish that affirmative defense by the preponderance of the evidence. *State v. Saini*, 2d Dist. Greene No. 2013 CA 36, 2014-Ohio-5582, ¶ 30. "A person is not guilty by reason of insanity only if he proves * * * that at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts." *Id.* citing R.C. 2901.01(A)(14).

{¶ 14} Here the jury did not lose its way in finding that Mitchell failed to establish his NGRI defense by the preponderance of the evidence. Although two of the three expert witnesses concluded that Mitchell suffered from a severe mental disease or defect at the time of his offenses, only psychologist Bergman opined that, as a result, he did not know the wrongfulness of his actions. Having reviewed Bergman's testimony, we note that little of it addressed why she reached that conclusion. After opining at length about the existence of a severe mental illness, defense counsel asked whether Mitchell was able to determine the wrongfulness of his conduct. Bergman responded that, in her opinion, "mania took over" and that "because of the acute manic episode, he was not thinking rationally, he was not making rational choices with decisions." (Trial Tr. at 577). Strictly speaking, this response does not establish that Mitchell failed to know the wrongfulness of his conduct. Pointing out that Mitchell was experiencing a manic episode and was not thinking "rationally" does not directly address whether he appreciated the wrongfulness of his conduct. In any event, on re-direct examination Bergman did confirm, albeit without any elaboration, her belief that Mitchell was unable to determine whether his actions were right or wrong. (*Id.* at 652).

{¶ 15} In their subsequent testimony, psychologists Martin and De Marchis

disagreed with Bergman's conclusion that Mitchell failed to know the wrongfulness of his actions. In support of his conclusion, Martin relied largely on Mitchell's responses to questions when Martin interviewed him in jail. When Martin inquired about events leading up to the shooting, Mitchell recalled that he had become angry with Nilson inside her home when he discovered that she was using her cell phone to obtain drugs. (*Id.* at 778). According to Martin, Mitchell stated: " 'I knew it was wrong to yell at her because I was scaring her * * *.' " (*Id.*). After feeling threatened by Nilson, Mitchell retrieved a handgun from a cabinet and pointed it at her. According to Martin, Mitchell recalled that he " 'knew it was wrong' " to point the gun at Nilson but he " 'was still mad.' " (*Id.* at 780). Mitchell then forced Nilson out the front door and into the yard at gunpoint. (*Id.*). With regard to the shooting, Mitchell claimed he " 'didn't know the gun was loaded.' " (*Id.* at 781). He admitted to Martin, however, that he fled in Nilson's car because he " 'just wanted to get out of there' " and " 'thought the police would come and arrest [him] for killing [Nilson][.]' " (Id. at 782). Mitchell added that he attempted to evade the police because he " 'figured they were going to [Nilson's] house to see what happened[.]' " (*Id.*). According to Martin, Mitchell added: " 'I knew I was in trouble. I knew the police were after me about Melissa and I had to get away.' " (*Id.* at 783). Mitchell also " 'knew it was wrong' " to fight with the police when they apprehended him but felt like he " 'had to defend' " himself. (*Id.*). In Martin's opinion, Mitchell's account of the events indicated that he knew the wrongfulness of his actions at the time of his offenses. (*Id.* at 786, 800-802, 823).

{¶ 16} Psychologist De Marchis reached the same conclusion based on Mitchell's actions at the time of his offenses. (*Id.* at 962). He explained:

> How can we determine if someone has [knowledge that what he is

doing is wrong]? Well, by the description of their actions and behaviors on or about at the time, especially at the time of the offense. So, let's say that somebody believed that so and so was the devil and they killed the devil. Why would they run away from the scene? They did something that most people would applaud.

Well, in this case absolutely not. He shot someone who was defenseless at that point, fled the scene, tried to avoid apprehension as he was being pursued, and further fought with the officers once they got to it. All of those behaviors are not indicative of a mental illness. They're indicative of someone who knows that something is wrong and wants to avoid apprehension and possibly avoid the consequences of the behavior.

(*Id.* at 898-899).

**{¶ 17}** On cross examination, De Marchis further explained:

\* \* \* So a lot of people, who make [sic] commit crimes, may say—may claim that they had some hallucinations that told them to do that, or the devil made me do it, or whatever; in reality it's their own thoughts, their own fantasies, and then acting on them or refraining from them. And even if someone heard those voices, those voices would not necessarily lead an individual to actually comply with whatever the voices told them to do. You can still exercise restraint and know right from wrong in spite, even in spite of a command type hallucination that tells you, " 'Kill your brother.' "

\* \* \*

What I have is objective psychological testing that is telling me that

[Mitchell] is way exaggerating whatever symptomology there might be there. So, in other words, as an examiner, I cannot take everything at face value; I have to take it with a grain of salt, and especially if I have collateral information describing the actions, and especially if I'm able to determine that there were, the actions were purposeful and goal directed, then I have to come to the conclusion that the individual in spite of whatever might have been going on; in spite of paranoia and delusions, knew the wrongfulness of their actions at the time of the offenses.

(*Id.* at 932-933).

{¶ 18} Finally, De Marchis engaged in the following discussion with the prosecutor on re-direct examination:

Q. Okay. Well, and let me ask you this, do you have—did you come to a different conclusion then [sic] Dr. Martin as to the Defendant's knowing the wrongfulness of his behavior at the time?

A. I did not come to a different conclusion. I mean, we both came to the conclusion that he did know the wrongfulness of his actions at the time of the offense. And this is in spite of whether or not he suffered from psychosis or schizophrenia, or a character disorder, or a drug induced psychosis, irrelevant of those diagnoses, the central issue is knowledge of the wrongfulness of the action at the time of the offense, and we concluded that he had that knowledge, and his actions demonstrated that at the time he did have that knowledge.

Q. Okay.

A. That was our conclusion.

* * *

Q. You also mentioned something about goal-direct, purposeful goal-directed actions that addressed the Defendant's knowledge of the wrongfulness of his behavior. What were those in this case for you?

A. Well, chasing after the victim, who is fleeing the house, ignoring her pleas, standing over her, and pulling the trigger, and calling her a stupid bitch while you do that. I'm not sure there's any psychosis that would manifest itself in such a way. It's a lot more consistent with rage and anger. After the shooting—okay, he might have paced back and forth, perhaps realizing the magnet [sic] of what he did.

Q. Uh-huh.

A. He might have called her name, wishing perhaps that he had not killed her. But then he went in the house, grabbed the car keys, got in the car and fled the scene. Is that purposeful behavior? Well, of course it is. Assuming that you're in the midst of a psychotic episode, you just shot someone, why would you leave the scene?

Q. Uh-huh.

A. So being chased then after the accident by the police officer and pointing your fingers at them as if you're holding a gun, and ignoring the—again, you're fleeing and eluding.

Q. Uh-huh.

A. Again, that's purposeful, goal-directed behavior; goal-directed, trying to

avoid apprehension. So when you are engaging in such behaviors, it's understood that you know the wrongfulness of your actions.

(*Id.* at 962-964).

{¶ 19} After examining the competing expert testimony, we conclude that the jury did not lose its way in apparently choosing to credit the testimony of Martin and De Marchis over the testimony of Bergman as to whether Mitchell knew the wrongfulness of his actions. As set forth above, Martin relied largely on Mitchell's admissions during an interview that he knew what he was doing was wrong at the time of his offenses. De Marchis relied largely on Mitchell's actions at the time of the offenses to infer that he knew what he was doing was wrong. The record contains ample evidence supporting both experts' conclusions. This is not an exceptional case where the evidence weighs heavily against the jury's rejection of Mitchell's NGRI defense. Accordingly, the first assignment of error is overruled.

{¶ 20} In his second assignment of error, Mitchell argues that the trial court erred in instructing the jury, thereby violating his due-process rights. He raises two specific issues. First, he contends the trial court erred in rejecting his request for an instruction regarding the role that drug usage and intoxication may play in the NGRI determination. Second, he claims the trial court incorrectly worded an instruction it gave concerning a defendant's inability to refrain from doing his acts.

{¶ 21} With regard to the former issue, Mitchell requested the following instruction found in Section 421.27 of the Ohio Jury Instructions: "Voluntary intoxication, no matter how extreme, is not an insane condition. However, a defect or disease of the mind caused by the use of (intoxicants) (drugs) and resulting in insanity, as previously defined, is a

defense to an offense." Mitchell argued to the trial court that the second sentence in particular was pertinent in this case. (Trial Tr. at 988). The trial court refused to give the instruction for two reasons. First, it found no evidence of intoxication. Second, with regard to drug use causing a defect or disease of the mind, the trial court reasoned: "[T]he Court holds [that] was not testified to by the necessary expert burden to indicate that that was anything more than a possibility in this case, not even a probability which is the State's only burden. So we're going to exclude that." (*Id.* at 988-989).

{¶ 22} We note that "[r]equested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction. * * * An appellate court reviews a trial court's refusal to give a requested jury instruction for abuse of discretion." (Citations omitted.) *State v. Adams*, 144 Ohio St. 3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 240.

{¶ 23} We see no abuse of discretion here. Based on the evidence before it, the trial court reasonably concluded that the requested instruction was unwarranted. As for intoxication, the record reflects that Mitchell regularly consumed some alcohol. (Trial Tr. at 894). He had not consumed any alcohol, however, on the day in question. (*Id.* at 665, 894, 923). The trial court also acted within its discretion in finding insufficient evidence to justify an instruction about drugs causing a disease or defect of the mind. Although Mitchell had a history of drug use and abuse, the only drug detected in his system upon his arrest was a trace of Xanax, a benzodiazepine. (*Id.* at 925). More importantly, none of the three psychological experts opined that Mitchell had a disease or defect of the mind caused by the use of drugs. Bergman testified Mitchell did have a mental disease or

defect, namely "schizoaffective disorder bipolar type" with an "acute manic episode." (*Id.* at 573). She never suggested, however, that his psychosis was drug-induced. To the contrary, she explained: "[W]hen someone is experiencing a drug-induced psychotic episode once the body metabolizes the drug usually the symptoms begin to subside. But that was not, that was not what was happening." (*Id.* at 564-565). Martin diagnosed Mitchell as having a non-specified mental disease or defect. (*Id.* at 816-817). He explicitly expressed no opinion as to whether Mitchell's mental illness was drug induced. (*Id.* at 817). Finally, De Marchis testified that he believed Mitchell was malingering and did not have any true psychotic disorder at all. Although he disbelieved Mitchell's claims about hallucinations and delusional paranoia, he testified that if those claims were true then the most likely explanation was "either drug intake or alternatively drug withdrawal." (*Id.* at 897). Therefore, De Marchis agreed that "drug induced psychosis" was "possible" in Mitchell's case. (*Id.* at 935).

{¶ 24} In our view, the trial court did not abuse its discretion in refusing to instruct the jury about drug use potentially causing a disease or defect of the mind where (1) the only drug found in Mitchell's system was a trace amount of a benzodiazepine, (2) no expert witness opined that Mitchell had a disease or defect of the mind caused by drug use, and (3) one expert testified that "drug induced psychosis" was "possible" but that he did not believe Mitchell had any psychosis at all.

{¶ 25} Mitchell's second jury-instruction argument concerns the following instruction given by the trial court: "It is not a defense that the Defendant's reason at the time of the offense was so impaired that he did not have the ability to refrain from doing his act or acts." (*Id.* at 1069). This instruction paraphrased R.C. 2945.391, which states

in part: "Proof that a person's reason, at the time of the commission of an offense, was so impaired that the person did not have the ability to refrain from doing the person's act or acts, does not constitute a defense."

{¶ 26} Despite Mitchell's argument to the contrary, we see no meaningful, substantive difference between the statutory language and the instruction given by the trial court. Mitchell argues that the statute talks about "proof" whereas the trial court's instruction did not. Although the trial court did omit the word "proof," we fail to see how that prejudiced Mitchell. In essence, the trial court's instruction presumed that "proof" existed (which, if anything, would benefit Mitchell) and proceeded directly to the substance of the instruction. We also reject Mitchell's claim that the trial court's instruction would preclude any defendant from ever prevailing on an insanity defense. The point of both R.C. 2945.391 and the trial court's substantially-similar instruction appears to be that impaired reasoning resulting in a lack of ability to control one's conduct (i.e., an "irresistible impulse") does not establish an insanity defense. This is a correct statement of law.[3] *See* R.C. 2901.01(A)(14) ("A person is not guilty by reason of insanity only if he proves * * * that at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts."). We see no error or prejudice to Mitchell in the trial court's paraphrasing of R.C. 2945.391. The second assignment of error is overruled.

---

[3] "Years ago, legal insanity in Ohio could be based upon two distinct theories. One theory was the inability of a person to comprehend the wrongfulness of his or her actions. That theory has been maintained in Ohio law." *State v. Muhammad*, 10th Dist. Franklin No. 07AP-609, 2008-Ohio-2839, ¶ 15. "The other theory was commonly referred to as the irresistible impulse test—the individual knew the activity was wrong but could not refrain from doing the wrong activity anyway. The Ohio legislature redefined legal insanity in Ohio to exclude situations involving irresistible impulse." *Id.*

{¶ 27} In his third assignment of error, Mitchell asserts that he received ineffective assistance of trial counsel. Specifically, he argues that his attorney provided prejudicially deficient representation by failing to object to De Marchis' characterization of him as a habitual criminal.

{¶ 28} The testimony in question occurred after De Marchis diagnosed Mitchell as having "antisocial personality disorder," which he identified as a "character disorder" rather than a "psychotic disorder." (Trial Tr. at 872-873). De Marchis then provided the following explanation of an "antisocial personality disorder":

> * * * Antisocial personality disorder does not mean that you don't like to socialize. It's a character disturbance that pretty much would fit what we would describe as a habitual criminal; someone who lies, somebody who exploits others, someone who may abuse substances, someone who doesn't have a good work history, someone who is not responsible—those kinds of things.

(*Id.* at 874).

{¶ 29} Mitchell contends his attorney provided ineffective assistance by failing to object to this testimony. To prevail on an ineffective-assistance claim, a defendant must show deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To show deficiency, a defendant must show that trial counsel's representation fell below an objective standard of reasonableness. *Id.* Prejudice exists and a reversal is warranted only where a defendant shows a reasonable probability that but for counsel's deficient performance the result of the proceeding would have been different. *State v. Bradley*, 42 Ohio St.3d 136, 142, 538

N.E.2d 373 (1989).

{¶ 30} We see no ineffective assistance of counsel here. Mitchell's NGRI defense placed at issue whether he had a mental disease or defect. De Marchis concluded that he did not. Instead, De Marchis opined that Mitchell had a "character disorder," which the psychologist specifically identified as "antisocial personality disorder." In our view, De Marchis was entitled to describe antisocial personality disorder, as the meaning of that diagnosis would not be readily apparent to the average juror. The fact that his example characteristics of the disorder could be unflattering to Mitchell did not render De Marchis' testimony improper. If Mitchell disputed those characteristics or believed they were unsupported in his case, defense counsel remained free to cross examine De Marchis about his diagnosis.

{¶ 31} Even assuming, arguendo, that the challenged testimony was improper, we would find no prejudice. Mitchell was charged with, among other things, the execution-style murder of his girlfriend. Defense counsel did not dispute that Mitchell committed that offense or the others with which he was charged. The only real issue was whether Mitchell had a mental disease or defect that caused him not to know right from wrong. That issue was the subject of extensive testimony by three expert witnesses. We are convinced that the challenged brief description of an antisocial personality disorder had no effect on the jury's resolution of the central issue in the case. The third assignment of error is overruled.

{¶ 32} The judgment of the Montgomery County Common Pleas Court is affirmed.

. . . . . . . . . . . . .

FAIN, J., and FROELICH, J., concur.

Copies mailed to:

Mathias H. Heck
Lynne R. Nothstine
Lori R. Cicero
Hon. Gregory F. Singer