[Cite as *State v. Russell*, 2025-Ohio-2613.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 2024-CA-67 |
| | : | |
| v. | : | Trial Court Case No. 2023CR0474 |
| | : | |
| DENNY B. RUSSELL | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on July 25, 2025, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

[[Applied Signature]]
RONALD C. LEWIS, JUDGE


Tucker, J., and Huffman, J., concur.

**OPINION**
GREENE C.A. No. 2024-CA-67

DAVID R. MILES, Attorney for Appellant
MEGAN A. HAMMOND, Attorney for Appellee

LEWIS, J.

{¶ 1} Defendant-Appellant Denny B. Russell appeals from a judgment of the Greene County Common Pleas Court, which convicted him of one count of felonious assault following a bench trial. For the following reasons, we will affirm the judgment of the trial court.

I.      Facts and Course of Proceedings

{¶ 2} On September 1, 2023, a Greene County grand jury indicted Russell on one count of felonious assault, a second-degree felony in violation of R.C. 2903.11(A)(1). On September 29, 2023, Russell filed a motion for a competency evaluation and a plea of not guilty by reason of insanity ("NGRI"). After a competency/sanity evaluation, the trial court found Russell competent to stand trial. The court based its finding on the report of Dr. Massimo De Marchis.

{¶ 3} Russell filed a motion for a second evaluation for NGRI and an appropriation of funds to retain an expert. The trial court granted the motion and approved funds for Russell to be evaluated by Dr. Daniel Davis. On March 20, 2024, the trial court found Russell competent to stand trial. The court based this finding on the report of Dr. Davis. The next day, Russell entered an NGRI plea. Russell subsequently waived his right to a jury trial and requested a bench trial.

{¶ 4} A bench trial was held on May 6, 2024. The parties stipulated that Drs. De

Marchis and Davis were experts in the field of forensic psychology. The parties further stipulated to the admission into evidence of the expert reports of Drs. De Marchis and Davis.

{¶ 5} Greene County Sheriff's Deputy Brandon Mundy testified first at the trial. He was dispatched to an August 20, 2023 collision involving a motorcyclist and Russell, who was driving a red Honda Accord. When he arrived, Deputy Mundy noticed that Russell was drenched in sweat and was extremely abrasive. At first, Russell did not want to speak with him. Deputy Mundy spoke with a female victim and two other witnesses. Eventually, Deputy Mundy spoke with Russell, who appeared frantic and attempted to justify his actions. Russell stated, "Take me to jail if you need to" or "If you have to, take me to jail." Trial Tr. 24-25. Russell ultimately was arrested based on the statements made by the victim and third-party witnesses. According to Deputy Mundy, Russell seemed to understand why he was being arrested. Russell mentioned multiple times that people were out to get him, he was going to die, and people were going to kill him.

{¶ 6} The victim testified next. She was driving her car home from a couple's trip to Kentucky when Russell and the victim's fiancé got into a traffic collision. Her fiancé was riding a motorcycle at the time of the incident. She witnessed Russell tailgating her fiancé and driving erratically and aggressively toward her fiancé. The victim saw her fiancé's motorcycle hit the driver's side of Russell's car, and the motorcycle went into a ditch on the side of the road. Her fiancé landed on the other side of the road face down.

{¶ 7} After the victim and Russell stopped their vehicles, she approached Russell and asked him what he was thinking. She said, "You have four walls and four wheels, and he only has two. Why?" *Id.* at 47. The victim characterized herself as emotional but not aggressive or in Russell's face. Russell responded, "There are 200 of these f*ckers around here. F*ck him." *Id.* at 48. Russell punched the victim in the face. Russell then grabbed

the victim, and they ended up in the ditch on the side of the road, rolling around and hitting each other.   The victim suffered injuries to her face, shoulder, and foot.   She confirmed that the pictures in State's Exhibits 2.1 through 2.8 showed injuries that she suffered at the hands of Russell.   She was also diagnosed with PTSD.

{¶ 8} Chelsea Jones and her husband witnessed the altercation between Russell and the victim.   She testified that she saw Russell strike the victim first, and then they fell down into the ditch for about one or two minutes.

{¶ 9} Dr. Jordan Jacobson, an emergency room doctor with the Miami Valley Hospital Network, testified that he treated the victim on the night of the incident with Russell.   Dr. Jacobson diagnosed her with a broken foot.

{¶ 10} Following the testimony of Dr. Jacobson, the State rested its case.   Russell moved for an acquittal pursuant to Crim.R. 29, which the trial court overruled.

{¶ 11} Dr. Davis then testified for the defense.   He is one of only 351 board-certified forensic psychologists in the United States.   He met with Russell for a total of three hours to interview him and conduct testing.   Dr. Davis also reviewed discovery materials, medical records, and the competency report of Dr. De Marchis.   Dr. Davis explained that if a person were truly delusional, he or she would interpret everything in the context of that particular delusional belief system.   Dr. Davis conducted the Minnesota Multiphasic Personality Inventory – 3 ("MMPI-3") test with Russell.   According to Dr. Davis, this test showed that Russell had significant thought dysfunction and was not feigning symptoms.   However, Dr. Davis conceded that no test existed that would show the precise mental condition of a person at the time a prior offense was committed.   On the day of the offense, Russell believed that people were after him, and he had a strong persecutory delusion about motorcyclists.   Although Russell suffered from a severe mental disease, he did not have an

intellectual disability. Dr. Davis opined that (1) Russell's behavior during the incident with the victim was consistent with someone responding to paranoia; (2) Russell thought he was acting in self-defense when he injured the victim; and (3) Russell did not know the wrongfulness of his actions when he injured the victim.

{¶ 12} On cross-examination, Dr. Davis stated that it was very unlikely that Russell had experienced hallucinations during the incident involving the victim. According to Dr. Davis, Russell connected his delusional motorcycle belief system to the victim because she became angry with Russell about his collision with the motorcyclist and told him to be more careful. Russell was very angry at the victim and expressed to Dr. Davis a belief that she was part of a conspiracy against him. Dr. Davis's opinion that Russell did not know the wrongfulness of his actions during his interaction with the victim was based largely on the fact that Russell was using self-defense as a justification for his actions and expressed this in the context of his longstanding, fixed, delusional belief system. Dr. Davis believed that Russell was in fear for his safety at the time of the incident with the victim. On cross-examination, Dr. Davis conceded that someone who was suffering a delusion and was in an alternate reality could still be capable of knowing the wrongfulness of his actions.

{¶ 13} Dr. Davis's written report was admitted into evidence at trial. In his report, Dr. Davis explained that he had examined Russell, conducted psychological testing, and reviewed several discovery materials. He stated that Russell "exhibited paranoid beliefs that appeared to be of delusional proportions." Although Russell denied any delusional thinking, Dr. Davis noted that Russell provided an elaborate paranoid belief system in which Russell was being targeted by former students as well as motorcycle gangs. Russell completed the MMPI-3 examination, which is "a standardized self-report inventory of psychological functioning." Based on the test results, Dr. Davis stated that Russell's

responses indicated significant thought dysfunction and prominent beliefs of persecution that may rise to the level of paranoid delusions. While Dr. Davis noted that the MMPI-3 test was a newer and different instrument than the MMPI-2 administered by Dr. De Marchis, he explained that the findings of likely paranoid delusional disorder were seen in both assessments.

{¶ 14} Dr. Davis recounted in his report a lengthy statement made to him by Russell about former students and motorcyclists who had harassed him for several years. Russell told Dr. Davis that the victim and her fiancé were the same people he had seen months earlier riding on the fiancé's motorcycle and harassing him. According to Dr. Davis, "I asked Mr. Russell if at the time of the incident, or now, if he thought anything that he did was wrong or could be seen as illegal. Mr. Russell told me no. He said that he felt that he was justified in doing what he was doing as it was self-defense against the people who were pursuing him as part of the association with the motorcyclists."

{¶ 15} Dr. Davis identified the following factors that weighed in favor of finding that Russell knew the wrongfulness of his actions at the time of the incident with the victim: (1) Russell had the intellectual capacity to know the wrongfulness of the acts; and (2) Russell may have acted out of anger in a "road rage" state. Dr. Davis identified the following factors that weighed against a finding that Russell knew the wrongfulness of his actions at the time of the incident with the victim: (1) Russell made statements to the police about being pursued by motorcyclists; (2) he made a similar statement to the victim; (3) Russell was diagnosed as psychotic in an earlier, very similar instance; (4) he made similar previous complaints to law enforcement; (5) due to his psychotic state, he was not able to recognize reality or think in a rational manner; (6) he continued to put forth his delusional beliefs in the interview with Dr. Davis; and (7) the police described him as "sweaty and extremely apprehensive," which

was consistent with a person who was fearful and paranoid rather than simply angry. Dr. Davis concluded that the evidence that Russell did not have the psychological capacity at the time of the offense to know the wrongfulness of his acts outweighed the evidence that he had the capacity to know the wrongfulness of his acts.

{¶ 16} Dr. De Marchis testified last at the trial as a rebuttal witness for the State. He has been a clinical psychologist in Ohio since 1988 and has conducted forensic evaluations since 2001. He is not board-certified in forensic psychology. He spent one and one-half hours evaluating Russell and then conducted some testing. Dr. De Marchis reviewed the indictment and the Sheriff's Office's narrative supplement but did not review any of Russell's past medical records or the police body-camera footage. During the evaluation, Russell stated that he had been the victim and denied punching and kicking the victim.

{¶ 17} Dr. De Marchis testified that the results of the MMPI-2 that he administered and the MMPI-3 that Dr. Davis administered were basically identical. The MMPI tests do not measure whether someone knew the wrongfulness of their actions during an incident. Dr. De Marchis noted that Russell had never previously acted violently as a result of his delusions. This was a key fact that led Dr. De Marchis to conclude that Russell knew the wrongfulness of his actions when he injured the victim. According to Dr. De Marchis, the injuries to the victim were more likely a result of Russell's exhibiting anger akin to a road rage episode than a result of Russell's believing he was defending himself. Dr. De Marchis noted that Russell previously had control over his actions and went to the police rather than having violent outbursts against the people he believed were chasing him. He also emphasized that Russell hit the victim rather than the motorcyclist, which was more consistent with road rage than self-defense.

{¶ 18} On cross-examination, Dr. De Marchis conceded that a severe mental illness

like Russell's could impact a person's ability to know right from wrong. He also agreed that Russell told him that he was 75% sure that the victim and her fiancé had previously chased him. Further, Dr. De Marchis stated that there was no question that Russell believed that a motorcycle gang had been chasing him for a while.

{¶ 19} Dr. De Marchis's expert report was admitted into evidence at trial. He had evaluated Russell in October 2023. Russell explained to Dr. De Marchis that while he was at a McDonald's drive-thru, a group of motorcyclists were waiting for him around the corner. When Russell drove away, the motorcyclists dispersed, and he decided to get behind the victim's fiancé, who started yelling at Russell that he was too close to the motorcycle. Russell drove around the motorcycle, and the victim eventually drove around Russell's car and cut him off, causing him to slam on his brakes. The victim's fiancé then ran his motorcycle into the back of Russell's car. According to Russell, the victim got out of her car and ran toward him while telling him that the motorcyclist was her fiancé and that Russell was supposed to stay further back from motorcycles. Russell explained, "I told her why are you talking to me? Why aren't you there helping him? She put her hands on me. I went to pull her hands off of me. I grabbed her wrists, she's a large lady, she lost her balance. She was trying to grab my nuts. We both sat in the thing. She started mouthing off to me. . . . We tumbled down the hill, I told them I tried to grab her hands." Russell denied punching and kicking her.

{¶ 20} Dr. De Marchis administered the MMPI-2 test. Significant elevations were noted on the paranoia and psychopathic deviant scales. Based on his examination of Russell and review of the police narrative, Dr. De Marchis concluded that at the time of the alleged offense, Russell "was suffering from a severe mental disease but not from a severe mental defect. Despite suffering from such severe mental disease, he knew the

wrongfulness of the acts charged." Dr. De Marchis opined that Russell's punching, kicking, and hitting of the victim were motivated by anger rather than by a severe mental disease or defect of the mind.

{¶ 21} On July 24, 2024, the trial court found Russell guilty of felonious assault. The court found that Russell suffered from a severe mental disease, but that Russell had failed to meet his burden of proving by a preponderance of the evidence that he did not know the wrongfulness of his actions at the time of the offense. Rather, the trial court found that Russell's assault on the victim, "an unarmed female on foot, was consistent with straightforward rage and anger."

{¶ 22} The trial court sentenced Russell to a minimum prison term of two years and a maximum term of three years. The court credited Russell with 382 days of jail-time credit and ordered him to pay all costs of prosecution. It did not impose a fine. Russell filed a timely notice of appeal.

II.     Russell's Conviction Was Not Against the Manifest Weight of the Evidence

{¶ 23} Russell's two assignments of error state:

APPELLANT'S CONVICTION FOR FELONIOUS ASSAULT IS BASED UPON INSUFFICIENT EVIDENCE.

APPELLANT'S CONVICTION FOR FELONIOUS ASSAULT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 24} Russell was convicted of a violation of R.C. 2903.11(A)(1), which states: "(A) No person shall knowingly do either of the following: (1) Cause serious physical harm to another or to another's unborn[.]" Pursuant to R.C. 2901.22(B), "[a] person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably

cause a certain result or will probably be of a certain nature."

**{¶ 25}** Russell argued at trial that he was NGRI.   According to R.C. 2901.01(A)(14), a person is NGRI if "at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts." This is an affirmative defense, which means Russell bore the burden of establishing that he was NGRI.   *See State v. Tibbetts*, 92 Ohio St.3d 146, 164-165 (2001); R.C. 2901.05(A). The NGRI defense must be proven by a preponderance of the evidence.   R.C. 2901.05(A); *Tibbetts* at 165.   "Preponderance of the evidence simply means 'evidence which is of a greater weight or more convincing than the evidence which is offered in opposition to it.' " *In re Starks*, 2005-Ohio-1912, ¶ 15 (2d Dist.), quoting *Black's Law Dictionary* (6th Ed. 1998).

**{¶ 26}** Although Russell raises assignments of error relating to manifest weight and sufficiency of the evidence, we have held that the evidentiary support for an NGRI defense should be analyzed in the context of a manifest weight standard rather than a sufficiency of the evidence standard.   *State v. Cochran*, 2017-Ohio-216, ¶ 51 (2d Dist.), citing *State v. Hancock*, 2006-Ohio-160, ¶ 35.   Therefore, we will limit our analysis to manifest weight.

**{¶ 27}** "A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive."   *State v. Wilson*, 2009-Ohio-525, ¶ 12 (2d Dist.), citing *State v. Hufnagle*, 1996 WL 501470 (2d Dist. Sept. 6, 1996).   When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' "   *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v.*

*Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). The weight to be given the evidence and the credibility of the witnesses concerning the establishment of an insanity defense in a criminal proceeding are primarily for the trier of fact. *State v. Thomas*, 70 Ohio St.2d 79, 80 (1982). Reversing a conviction under a manifest weight theory "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin* at paragraph three of the syllabus. "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2014-Ohio-3432, ¶ 24 (2d Dist.), citing *Wilson* at ¶ 14.

{¶ 28} In this case, both parties – and their experts – agreed that, at the time of the crimes, Russell was suffering from a severe mental disease. Where the parties' and the experts' opinions diverged, and what makes the difference in this appeal, is whether Russell knew the wrongfulness of his actions when he assaulted the victim on August 20, 2023.

{¶ 29} Dr. Davis believed that Russell did not know the wrongfulness of his actions, because he believed he was defending himself from the victim, who approached him after the collision and slapped him in the face. This is similar to what Russell told the police officer after the altercation with the victim. However, eyewitness testimony and the victim's testimony differed from Russell's account. The eyewitness and victim testimony labeled Russell as the aggressor who punched the victim when she approached him. Further, the injuries to the victim were not consistent with Russell's denial of punching or kicking the victim. In order to succeed on his NGRI defense, Russell needed to prove by a preponderance of the evidence that he did not know the wrongfulness of his actions *due to his severe mental disease*. If he were just angry from road rage or just defending himself from someone attacking him, he would not be successful with his NGRI defense. Rather, he needed to show that his severe mental disease caused him to believe that he needed to

defend himself from the victim. In other words, Russell needed to show that his delusions about motorcyclists following him were what caused him to assault the victim. Dr. Davis believed Russell showed this by stating that he had seen these two people before on a motorcycle and had previously been harassed by motorcyclists. We note that, in making this conclusion, Dr. Davis partially relied on the fact that Russell was sweaty and extremely apprehensive when the police officer arrived, which Dr. Davis opined was consistent with someone who was fearful and paranoid rather than simply angry. However, the evidence introduced at trial established that it was very warm on the day of the incident and that Russell had been involved in a physical altercation with the victim, which could have explained the sweating. And the apprehension could have been explained by the fact that Russell was fearful of being arrested for the injuries to the victim and her fiancé. Despite this, we cannot ignore the fact that Dr. Davis is a highly-qualified expert who authored a persuasive expert report. For example, he was one of only 351 board-certified forensic psychologists in the United States, reviewed some documents that Dr. De Marchis did not, and administered the MMPI-3 rather than the MMPI-2.

{¶ 30} On the other hand, Dr. De Marchis opined that Russell's punching of the victim was inconsistent with his past behavior when confronted by motorcyclists. According to Dr. De Marchis, Russell typically had not been violent in such situations. Therefore, Dr. De Marchis believed that Russell's actions toward the victim were more likely the result of road rage. Dr. De Marchis's opinion was also supported by the eyewitness and victim statements to the police, which described Russell as the aggressor rather than someone who was defending himself after being slapped in the face. Like Dr. Davis, Dr. De Marchis is a highly-qualified expert and authored a persuasive expert report.

{¶ 31} The trial court apparently accepted the opinion of Dr. De Marchis. "When

expert witnesses differ in their opinions regarding the insanity defense, a [trier of fact] must make a credibility determination when deciding which experts to believe. *State v. Petrie*, 2016-Ohio-4941, ¶ 5 (9th Dist.), citing *State v. Murphy*, 2016-Ohio-1165, ¶ 39 (4th Dist.). Both experts were highly qualified and experienced, authored persuasive expert reports, and offered articulate testimony in this case. We cannot say that the evidence weighed heavily in favor of either expert's opinion on whether Russell knew the wrongfulness of his actions when he assaulted the victim. In other words, the evidence in this case on the affirmative defense issue was balanced and, in these circumstances, we cannot conclude that this is the exceptional case in which we must reverse the conviction as against the manifest weight of the evidence. *See, e.g., State v. Mitchell*, 2016-Ohio-7691, ¶ 19 (2d Dist.) (concluding that the jury did not lose its way when it credited one expert's testimony over another); *Petrie* at ¶ 17 (holding that due to conflicting expert testimony, "the evidence in this case is balanced, and in these circumstances, we cannot say that this is the exceptional case in which we must reverse the conviction as against the manifest weight of the evidence").

{¶ 32} Based on the record before us, we cannot conclude the trier of fact lost its way. Therefore, Russell's conviction was not against the manifest weight of the evidence. Russell's assignments of error are overruled.


III.    Conclusion

{¶ 33} Having overruled Russell's assignments of error, we will affirm the judgment of the trial court.

. . . . . . . . . . . . .

TUCKER, J. and HUFFMAN, J., concur.